# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Edwin Rivera

    Plaintiff,

    v.

United States Citizenship and
Immigration Service,
District Director: Thomas Cioppa
New York State Attorney General
Office,
Roberto Lebron, Assistant Attorney
General
    Defendant(s)

## AMENDED COMPLAINT

Civil Action No.  **19 CV 03101**
Hon. Judge Failla

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8-8-19

The Plaintiff, for his complaint against Defendant(s), states and alleges the following:

### COMPLAINT FOR INJUNCTIVE RELIEF

1. **This is an action pursuant to the** Fifth Amendment to the U.S. Constitution (and the Fourteenth Amendment, in which it is repeated)**; and Freedom of Information ("FOIA"), for injunctive and other appropriate relief, seeking the approval of petitions and applications sought by Edwin Rivera, the Plaintiff.**

### JURISDICTION AND VENUE

2. **This Court holds subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) (2010) and 5 U.S.C. § 552(a)(6)(C)(i) (2010). Furthermore, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2010). The venue is proper in this district under 5 U.S.C. 552(a)(4)(B) (2010); 44 U.S.C. 1506; sec. 6, E.O. 10530, 19 FR 2709; 3 CFR, 1954–1958 Comp., p. 189.**

# I.    PARTIES

Plaintiff:

Edwin Rivera
1428 Zerega Avenue
Bronx, New York 10462-5410
PH: 347-439-1421
Email: rivera10462@outlook.com

Defendants:

New York State Attorney General Office,
Roberto Lebron, Assistant Attorney General (AAG)
NEW YORK CITY OFFICE
28 Liberty Street
New York, NY  10005
(212) 416-8000

United States Citizenship and Immigration Service (USCIS),
District Director: Thomas Cioppa
26 Federal Plaza
New York, New York 10278

1. **Plaintiff.** See Exhibit—1, pictures on our website. **We serve our community of clients whose families are unable to help them owed to personal reasons. These people welcome our prayers in their home and the monthly deliveries of household goods. Gradually, we develop a sense of friendship before preaching from the Bible and talking about the life of Jesus Christ, the son of God. Deacons and other elders of the Christian Church lead the way in prayers and in reading from the many sections of the Bible to have a better understanding of passages. Our purpose is to bring God into people's hearts and help with their seclusion. For people unable to leave their home to attend religious services, we pray together to make these persons feel a part of our community that prays to the Lord for peace, hope, and love.** See Exhibit—2, website.

2. **The Plaintiff holds religious services at our place to worship, the same place where we raise funds by selling accounting services, 1428 Zerega Avenue, Bronx, New York 10462. Working without landline telephones, grants, and other assistance, we have been self-funded since 1996, and function under the laws of the Internal Revenue Service (IRS), 501(c)(3).** See Exhibit—3, letter of determination from the IRS.

3. **The Plaintiff maintains an office, without telephones, ready to serve children attending schools within the neighborhood as well as their parents. They reach out for a host of services, including writing letters and filling out forms for immigration and school.**

4. The Defendant, United States Citizenship and Immigration Service, Thomas Cioppa, Director (USCIS), is a public authority established under the provisions of the U.S. Department of Homeland Security that administers the country's naturalization and immigration system and continues to do business and exist under the laws of the State of New York.

5. The Defendant maintains his offices at 26 Federal Plaza, New York, New York 10278 and at California Service Center, Laguna Niguel, CA 92607-0590.

6. At all relevant times, The Defendant was and is the supplier of immigration services for people residing in New York City.

7. The Defendant was and still is the Director of certain facilities used to acquire immigration benefits sought for religious workers (people who have been working to bring assistance to clients with special needs through prayer), including the adjustment of status, green cards, employment authorization cards, Provisional Unlawful Presence Waivers, and other services.

8. At all mentioned times, the Defendant provided approvals and denials of Form I-360, for Religious Workers. Furthermore, she owned, operated, managed, administered, controlled, supervised, and directed the processing of petitions, including but not limited to the adjustment of status, green cards, employment authorization cards, Provisional Unlawful Presence Waivers, and other services. Moreover, she owned, operated, managed, administered, controlled, supervised, and directed other service centers located at and near the California Service Center. The Defendant owns this service center and the distribution system serving Bronx, New York.

9. The Defendant is responsible for all petitions filed, distribution, and for the safe, competent, and reliable operation and maintenance of confidential information and distribution systems serving Bronx, New York.


## II.    THE PLAINTIFF'S PRESENTMENT OF PETITIONS

10. The Plaintiff is the director of the damaged and destroyed reputation and personal property located at 1428 Zerega Avenue, Bronx, New York 10462. From five in the morning (5 am)to twelve noon (12 pm), the Plaintiff prepares for and works hard for our program seven days a week. Religious workers, employed to support their families, work with our program, for thirty-five (35) to forty (40) hours without the expectation of any income. The Plaintiff has never received a salary for the charity work done in the areas of Bronx, New York and Puerto Rico. Instead, Plaintiff has paid for all the expenses from donations and income from accounting services.

11. Before the commencement of this action on or about March 23, 2018; September 17, 2019; December 5, 2018; petitions for benefits sought were duly delivered, and after that, to the Defendant by the United States Postal System. Petitions were filed for the following members of our organization:

| # | Name | USCIS CASE # | Priority Date |
|---|------|--------------|---------------|
| C0001 | Ramona Urena | WAC1890197304 | Mar 23, 2018 |
| C0002 | Josefina Torres | WAC1890197303 | Mar 23, 2018 |
| C0003 | Yeri Muniz | WAC1890197305 | Mar 23, 2018 |
| C0004 | Jeny Muniz | WAC1890197306 | Mar 23, 2018 |
| C0005 | Nayeli Vidals | WAC1890196430 | Mar 23, 2018 |
| C0006 | Erika Leonor | WAC1890196183 | Mar 23, 2018 |
| C0007 | Maximo Miranda | WAC1890196428 | Mar 23, 2018 |
| C0008 | Ma Lara | WAC1890196429 | Mar 23, 2018 |
| C0009 | Manuel Sanaguaray | WAC1890196184 | Mar 23, 2018 |
| C0010 | Luis Yamba Ushca | WAC1890393145 | Sep 17, 2018 |
| C0011 | Segundo Villa Paca | WAC1890393149 | Sep 17, 2018 |
| C0012 | Jose Villa Paca | WAC1890393151 | Sep 17, 2018 |
| C0015 | Segundo Lluilema Cajilema | WAC1890393150 | Sep 17, 2018 |
| C0016 | Digna Quijosaca Cajilema | WAC1890393152 | Sep 17, 2018 |
| C00 | Luis Pinta Cajilema | WAC1890393158 | Sep 17, 2018 |

| | | | |
|---|---|---|---|
| 17 | | | |
| | | | |
| C00 21 | Segundo Inga Naula | WAC1890393146 | Sep 17, 2018 |
| | | | |
| C00 22 | Vicente Prieto Fuentes | WAC1890393148 | Sep 17, 2018 |
| | | | |
| C00 23 | Angel Namina Sinchi | WAC1890393147 | Sep 17, 2018 |
| | | | |
| C00 24 | Segundo Ortega Lliguilema | WAC1890393153 | Sep 17, 2018 |
| | | | |
| C00 25 | Juan Lemache Zhuilema | WAC1890393156 | Sep 17, 2018 |
| | | | |
| C00 26 | Maria Upaya Sanaguaray | WAC1890393144 | Sep 17, 2018 |
| | | | |
| C00 27 | Segundo Lluilema Paca | WAC1890393154 | Sep 17, 2018 |
| | | | |
| C00 28 | Segundo Cayambe Aucanshala | WAC1890393155 | Sep 17, 2018 |
| | | | |
| C00 29 | Segundo Paca | WAC1890393157 | Sep 17, 2018 |
| | | | |
| C00 30 | Juan Collado Tejada | WAC1890402085 | Sep 21, 2018 |
| | | | |
| C00 31 | Gladis Consuegra de Collado | WAC1890402086 | Sep 21, 2018 |
| | | | |
| C00 32 | Ramon Mora | WAC1990009957 | Oct 03, 2018 |
| | | | |
| C00 34 | Maria Lluilema Cajilema | WAC1990077947 | Dec 05, 2018 |
| | | | |
| C00 36 | Manuel Munoz Chuqui | WAC1990077948 | Dec 05, 2018 |
| | | | |
| C00 | Jose Villa | WAC1990077946 | Dec 05, 2018 |

| | | | |
|---|---|---|---|
| 37 | | | |
| | | | |
| C00 38 | Manuel Granda Guaman | WAC1990077944 | Dec 05, 2018 |
| | | | |
| C00 39 | Segundo Lluilema | WAC1990077945 | Dec 05, 2018 |
| | | | |
| C00 40 | Jaime Quinchi Lluilema | WAC1990077943 | Dec 05, 2018 |
| | | | |
| C00 99 | Isabel Montero | WAC1990178551 | Mar 14, 2019 |
| | | | |

12. **Over 30 days have elapsed since we asked USCIS to approve these petitions, but they have been neglected or refused owed to an issue raised by the Assistant Attorney General, Roberto Lebron, who was audited by the Plaintiff in 2000. Over $90,000 was missing from the Puerto Rican Bar Association, where Lebron failed to explain the missing funds.** See Exhibit—4, riveratheaccountant.com
13. **The action is commenced within one year and 90 days after the date of the occurrence.**

## CAUSE OF ACTION #1

## VIOLATIONS OF DUE PROCESS, Fifth Amendment to the U.S. Constitution

14. **The Plaintiff repeats, reiterates, and realleges each and every allegation of this complaint contained in each of the following paragraphs with the same force and effect as if more fully set forth herein.**
15. **On or before March 23, 2018, the Defendant had actual notice that the geographic location of the Plaintiff's real property was 1428 Zerega Avenue, Bronx, New York 10462 and had threatened him with false allegations and false arrests made by the New York State Attorney General since 2004.** See Exhibit—5, Court of Claims lawsuit.
16. **The Defendant had actual notice that the neighborhood of 1428 Zerega Avenue, Bronx, New York 10462 was designated as being encompassed by the New York City Department of Consumer Affairs, Immigration Assistance Provider program by the City of New York. N.Y. Gen. Bus. Law §§ 460-a through 460-j and by Local Law 31, §20-770 et seq.** See Exhibit—6, contract with customers, as required by law. See Exhibit—7, bond required by law.
17. **According to the City of New York, any neighborhood in Bronx, New York had a "high likelihood of immigrants expecting immigration services."**

18. On February 10, 2015, the Immigration Assistance Provider program became the law and the Bronx and all residents of New York assisting customers with the preparation of immigration forms, were ordered by the City of New York Department of Consumer Affairs to post a $50,000 bond and prepare an employment agreement for the immigrants to read in both Spanish and English, among other documents to be read before any services were provided after 72 hours had passed. Prior to this law, we never had any restrictions for offices providing secretarial services.

19. On February 10, 2015, the New York State Governor and New York City Department of Consumer Affairs (DCA) publicly advised in an urgent announcement that any person looking for immigration services must become familiar with this new law.

20. At no time before or during the wait period for the Governor to sign the law did the Defendant take appropriate and reasonable measures to "de-energize" the services provided by our office (translation of documents, typing letters, and assisting clients with immigration forms which provide green cards through a process called the "adjustment of status" or "consular processing").

21. At no time before or during the ten (10)-year period, waiting for the signing of the new law, did the Defendant take appropriate and reasonable measures to "de-energize" the New York City law that permitted the Plaintiff to provide secretarial services (translation of documents, typing letters, and assisting clients with immigration forms which provide green cards through a process called the "adjustment of status" or "consular processing").

22. "De-energizing" the New York law would have afforded the Plaintiff protection from the abuse suffered in the hands of the Defendant. The application to permit the Plaintiff to assist immigrants was denied owing to the weak interest in reading the case involving allegations made by the Assistant Attorney General (AAG). Had this Defendant read the matter before the Court of Claims, the petitions filed might have never been denied.

23. Notwithstanding, the Defendant's actual notice of false allegations were made by Roberto Lebron, AAG, against the Plaintiff during the same period mentioned herein.

24. The Defendant(s) is aware that the Code of Professional Responsibility prohibits ex parte communications with the court; Matter of Edwin Rivera v. NYS Attorney General (NY Court of Claims).
(See Rose v. Himely (1808) 4 Cranch 241, 2 Led 608; Pennoyer v. Neff (1877) 95 US 714, 24 Led 565; Thompson v. Whitman (1873) 18 Wall 457, 21 l ED 897; Windsor v. McVeigh (1876) 93 US 274, 23 Led 914; McDonald v. Mabee (1917) 243 US 90, 37 Sct 343, 61 L ed 608. U.S. v. Holtzman, 762 F.2d 720 (9th Cir. 1985))

25. The Plaintiff demands that the Defendant(s) reverse all denials of the petitions and applications filed with the USCIS. Moreover, the Plaintiff denies that all allegations in violation of The Code of Professional Responsibility prohibit ex parte communications with the court; N.Y. Code of Professional Responsibility DR 7–110(B)(2).

26. On March 23, 2018, and thereafter, petitions were filed by the Plaintiff seeking immigration benefits for some employees and members of religious organizations affiliated with our organization, HBP Religious Program, a division of the Homeward Bound Program, a non-profit organization, 501(c)(3), servicing clients with special

needs. These petitions were denied due to false allegations made by the AAG. Every conceivable excuse was used to deny each petition, even with tens of documents as evidence for each beneficiary. See Exhibit—8, Juan Collado denial.

On or about February 15, 2019, the Petitioner received denials for each filed petition. The result of the denials is too costly for our program: the appeals cost an additional $675 for each denial received. This is an additional fee to the $435 already paid, when the fee for the same form is exempt for other applicants. The following individuals are exempt from paying the fees:

> Amerasians;

- o Self-petitioning abused spouses or children of U.S. citizens or permanent residents (Box 1.I. or Box 1.J. on the form);
- o Self-petitioning abused parents of U.S. citizens (Box 1.K. on the form);
- o Special Immigrant Juveniles (Box 1.C. on the form);
- o Iraqi nationals who worked for or on behalf of the U.S. government in Iraq (Box 1.L. or Box 1.M. on the form); or
- o Afghan nationals who worked for or on behalf of the U.S. government in Afghanistan (Box 1.L. or Box 1.N. on the form).

27. The USCIS used the excuse that they had read the Bronx Supreme Court decision made on October 19, 2005, almost fourteen (14) years ago. The Defendant, together with the AAG, orchestrated to deny the Plaintiff his civil rights.

> *"Mr. Rivera has been identified by the Executive Office for Immigration Review's Fraud and Abuse Prevention Program as a person of concern due to his history of prosecution for fraud and theft. Records show that as recently as October 2016, Mr. Rivera was arrested and ordered to serve jail time for violating a court order to pay restitution to the victims of his fraudulent practices and for continuing to provide immigration legal services despite a court order banning him from providing such services."* See Exhibit—9, OLAP denial letter. See Exhibit—9A, request for reconsideration.

The allegations were false, and those that supposedly filed the complaint were not found in the RJI; it was a fabrication to revenge. Meanwhile, the applications for employment, Form EOIR-31, OMB#1125-0012, Executive Office for Immigration Review Request for New Recognition and EOIR-31A, OMB#1125-0013, Request by Organization for Accreditation or Office of Legal Access were denied due to the false allegations and void court orders.

The Defendant had other personal reasons too. See Exhibit—4, 1993 Arrest.

28. The Plaintiff was never notified to attend [any] court hearings; as a result, the Marshall arrested Edwin Rivera without probable cause, several times, in New York. Furthermore, they had the Police in the Dominican Republic, while the Plaintiff was working for the United States Department of Labor as a Farm Labor Contractor, under orders from the AAG, arrest Rivera and detain him there from February 9, 2007 to February 22, 2007 under the most horrible jail conditions.

Moreover, they had the newspapers in Puerto Rico publish the Plaintiff's medical record to prevent the assistance offered to the farmers in Puerto Rico. As a Farm Labor Contractor, hundreds of farmworkers were contracted to work in the farms in Puerto Rico; labor is desperately required.

29. News of Edwin Rivera's arrests spread throughout the Bronx, New York, causing destruction to the Plaintiff's office and personal property beyond repair. The arrests were the tool used by the Defendant to discourage the beneficiaries of the petitions filed for religious workers. This made it almost impossible for our program to operate without employment authorization cards.

30. The Defendant was grossly negligent, careless, and reckless with regard to the ownership, operation, management, administration, control, supervision, and direction of petitions and systems, including but not limited to the adjustment of status, employment authorization cards, permission to travel for members to see their families after many years, and the right to hold employment at and near the location of the occurrence, as described herein, in that it failed to but should have suspended the provisions of the New York City Department of Consumer Affairs (DCA), or otherwise "de-energized" the law applicable to immigration form preparers, so as to avoid the contact of immigration forms and/or other services resulting in assisting the immigrants with a livelihood system and preventing the resultant damages we are experiencing. See Exhibit—10, contract of employment.

31. Moreover, the Defendant was separately grossly negligent, careless, and reckless in the ownership, operation, management, administration, control, supervision, and direction of processing petitions and systems, including but not limited to services, in that it failed to suspend the provision of the DCA to Bronx, New York and the Plaintiff's office in an effort to mitigate the risk of denials or the spread of damages, given that the Defendant did not suspend the provision of the new law providing instructions to form preparers within the community.

32. The aforementioned acts and omissions were substantial factors in bringing about the damages and destruction detailed in this complaint. The Defendant's actions constituted unjust discrimination against the Plaintiff's civil rights in relation to his religion, race, and color; additionally, such acts were in violations of the express provisions of N.Y. Civ. Rights Law § 40-c.

If there were any communications between the AAG without notice to the Plaintiff, we would require a copy of such communications. See, generally, Practice Commentaries

2211:6, 2211:7 under N.Y. C.P.L.R. 2211 in McKinney's Consolidated Laws of New York, Book 7B.

## CAUSE OF ACTION #2
## VIOLATION OF FAIRNESS, FIFTH AMEND OF THE CONSTITUTION

33. The Plaintiff repeats, reiterates, and realleges each and every allegation of this complaint contained in each of the following paragraphs with the same force and effect as if more fully set forth herein.

The Defendant is unmannerly. Unless the plaintiff is allowed to pray to a deity of his choosing, and in a method of his choosing, the Defendant should not force methods used in other religions upon the Plaintiff.

The beneficiaries of the petitions filed were denied the approval of these petitions that were desperately needed. Even with the evidence for the two years immediately preceding the time of application submitted, the Defendant continued to ask for details, with the knowledge that this was beyond the Plaintiff's control or that of the beneficiaries. Asking for methods and evidence possibly used in a more affluent society is akin to discriminating our religion.

34. The Plaintiff specifically attested to all the following:
    a. The title of the position offered to the alien. See Exhibit—2, evidence of employment and details found on our website, for the whole world to see.
    b. That the alien would not be engaged in secular employment and provided explanations of salary or any form of "non-salaried compensation;"
        *"If the religious worker received no salary but supported him or herself, and any dependents, provide verifiable documents to show how support was maintained. This may include, but is not limited to, audited financial statements, financial institution records, brokerage account statements, trust documents signed by an attorney, or other verifiable evidence."* USCIS.

    c. That the alien filed tax returns, under the provisions of the Internal Revenue Service; copies were provided to USCIS.
    d. That the alien would not and had not become a public charge, i.e.., they worked for 35 hours or more,

        1. To initiate outreach programs to serve the needy and the community.
        2. To visit hospitals, nursing homes, prison, shelters, and other institutions.
        3. To help with christenings, marriages, baptisms, and funerals.

    4. To initiate centers for the elderly or the youths/adults, or to provide food, clothing, and other outreach activities for the community.

    5. To solicit and receive contributions from all sources, including its resident members or other ministries, and to receive and hold, in trust or otherwise, funds received by gifts or bequest.

  e. That some aliens hold more than one job, to support their family here and in their country of origin.

35. The Defendant is so abusive that it poses demands beyond the duties of a religious worker in our organization. Our missions are religious and not secular in nature. See Exhibit—1.

36. The Defendant makes statements that are unclear for us to either admit or deny. Thirty-five (35) hours, as we see it, for some or most Americans, is a standard work-week. During the said number of hours, we assist the church and the churchgoers.

37. The Defendant is aware that most beneficiaries lack legal documents. Thus, their reasons to ask for "audited financial statements, financial institutions records, brokerage account statements, trust documents signed by an attorney, or other verifiable evidence acceptable to USCIS" is confusing. The Defendant has asked for audited financial statements, financial institutions records, brokerage accounts, and trust documents; such acts are to be viewed as malicious and in abuse of due process.

38. The Plaintiff, Edwin Rivera, is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. The Plaintiff is in the business of providing religious services to clients, such as prayers within their residence.


## ACCORDING TO SHALOM PENTECOSTAL CHURCH v. ACTING SECRETARY DHS, 783 F.3d 156 (3d Cir. 2015), PETITIONS WERE FILED.

39. Beneficiary Ramona Urena is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

40. Beneficiary Josefina Torres is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

41. Beneficiary Yeri Muniz is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

42. Beneficiary Jeny Muniz is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

43. Beneficiary Nayeli Vidals is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

44. Beneficiary Erika Leonor is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

45. Beneficiary Maximo Miranda is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

46. Beneficiary Ma Lara is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

47. Beneficiary Manuel Sanaguaray is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

48. Beneficiary Luis Yamba Ushca is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

49. Beneficiary Segundo Villa Paca is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

50. Beneficiary Jose Villa Paca is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

51. Beneficiary Jose Villa Paca is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

52. Beneficiary Segundo Lluilema Cajilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

53. Beneficiary Digna Quijosaca Cajilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

54. Beneficiary Luis Pinta Cajilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

55. Beneficiary Segundo Inga Naula is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

56. Beneficiary Vicente Prieto Fuentes is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

57. Beneficiary Angel Namina Sinchi is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

58. Beneficiary Segundo Ortega Lliguilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

59. Beneficiary Juan Lemache Zhuilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

60. Beneficiary Maria Upaya Sanaguaray is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

61. Beneficiary Segundo Lluilema Paca is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

62. Beneficiary Segundo Cayambe Aucanshala is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

63. Beneficiary Segundo Paca Paca is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

64. Beneficiary Juan Collado Tejada is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

65. Beneficiary Gladis Consuegra de Collado is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

66. Beneficiary Ramon Mora Mora is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

67. Beneficiary Maria Lluilema Cajilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

68. Beneficiary Manuel Munoz Chuqui is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

69. Beneficiary Jose Villa Villa is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

70. Beneficiary Manuel Granda Guaman is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

71. Beneficiary Segundo Lluilema Lluilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

72. Beneficiary Jaime Quinchi Lluilema is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. He is in the business of providing religious services to clients, such as prayers within their residence.

73. Beneficiary Isabel Montero is a religious worker organized under the laws of the State of New York, with his principal place of business in the County of the Bronx, State of New York. She is in the business of providing religious services to clients, such as prayers within their residence.

74. The burden of proof to establish eligibility for sought benefits is an abuse of discretion. Supporting documentation satisfy the burden of proof in these proceedings. See Exhibit—11, from part 2 of our mailing to USCIS.

75. The bar was raised due to the false allegations mentioned herein.

> As is aforementioned, the Plaintiff is a victim of Due Process Violations. Ex parte communications with the court are prohibited. N.Y. Code of Professional Responsibility DR 7-110(B)(2).

(See Earle v. McVeigh, 91 US 503, 23 L Ed 398. See also Restatements, Judgments 4(b). Prather v. Loyd, 86 Idaho 45, 382 P2d 910. Hanson v. Denckla, 357 US 235, 2 L Ed 2d 1283, 78 S Ct 1228. 30A Am Jur Judgments 44, 45. Renaud v. Abbott, 116 US 277, 29 L Ed 629, 6 S Ct 1194. Earle v. McVeigh, 91 US 503, 23 L Ed 398.)

Sabariego v. Maverick, 124 US 261, 31 L Ed 430, 8 S Ct 461, is not entitled to respect in any other tribunal.

Meanwhile, the Defendant denied all petitions and applications. Since the Plaintiff's character and fitness was evaluated by "an examination of factors such as: criminal background; prior acts involving dishonesty, fraud, deceit, or misrepresentation; past history of neglecting professional, financial, or legal obligations," the court orders were not entitled to respect in any tribunal.

MOREOVER, "Mr. Rivera has been identified by the Executive Office for Immigration Review's Fraud and Abuse Prevention Program as a person of concern due to his history of prosecution for fraud and theft. Records show that as recently as October 2016, Mr. Rivera was arrested and ordered to serve jail time for violating a court order to pay restitution to the victims of his fraudulent practices and for continuing to provide immigration legal services despite a court order banning him from providing such service."

## DISHONESTY, FRAUD, AND MISREPRESENTATION

The matter of 1576/2004 (Bronx Supreme Court) is based on fraudulent prosecution; furthermore, the allegations were false and a result of revenge due to an audit, conducted by the Plaintiff, of the books and records of the Puerto Rican Bar Association, where the AAG, Lebron, was the person responsible. The Bar was looking for an accountant and hired the Plaintiff, Edwin Rivera, to conduct the audit.

An inspection of the Election Board records of Judge Gerald Esposito conducted by the Plaintiff found trace of election fraud. The Judge was biased in action before him by this Plaintiff of real estate and bank fraud. The very same people being sued had paid unknown sums of money to finance the judge's six-month campaign before the elections. At the end of the campaign, the judge did not file a report with the election board, claiming that the expenses were less than one thousand ($1000) dollars. Meanwhile, the printer said that he had received over seven thousand ($7000) and that the judge's campaign employees had

received their full salary. See Exhibit—12, In Tiny Courts of N.Y., Abuses of Law and Power, by William Glaberson, Sept. 25, 2006.

Again, the Plaintiff's attorney was never notified to appear for any hearings before 2016. There was much abuse, so much so, that after the court decision of August 2016, a notice of appeal was filed five (5) days later; additionally, the AAG got a different Judge to sign an order to arrest the Plaintiff, ex parte, while the Plaintiff was perfecting the appeal.

The Judge who had decided in August 2016, and after the notice of appeal was timely served to the AAG, probably never saw the demand for the arrest of the Plaintiff, while the Plaintiff was perfecting the appeal.

"*A void judgment does not create any binding obligation.*" Federal decisions addressing the void state court judgments include Kalb v. Feuerstein (1940) 308 US 433, 60 S Ct 343, 84 Led 370; Ex parte Rowland (1882) 104 U.S. 604, 26 L.Ed. 861

   i.   <u>Void Orders Can Be Attacked at Any Time</u>

   ii.   An order that exceeds the jurisdiction of the court is void, or voidable, and can be attacked in any proceeding in any court where the validity of the judgment comes into issue.
(See Rose v. Himely (1808) 4 Cranch 241, 2 Led 608; Pennoyer v. Neff (1877) 95 US 714, 24 Led 565; Thompson v. Whitman (1873) 18 Wall 457, 21 l ED 897; Windsor v. McVeigh (1876) 93 US 274, 23 Led 914; McDonald v. Mabee (1917) 243 US 90, 37 Sct 343, 61 L ed 608. U.S. v. Holtzman, 762 F.2d 720 (9th Cir. 1985))
"*Portion of judgment directing a defendant not to import vehicles without first obtaining approval ... was not appropriately limited in duration and, thus, the district court abused its discretion by not vacating it as being prospectively inequitable.*" Id at 722

MOREOVER, even where stature authorizes ex parte relief, due process may well require an early return date on the underlying motion. Indeed, depending on the circumstances, the judge may require at least a telephone notice to the other side or an immediate hearing at some place other than the courthouse.
(See Fosmire v. Nicoleau, 144 A.D.2d 8, 536 N.Y.S.2d 492 (2d Dep't 1989), order aff'd, 75 N.Y.2d 218, N.Y.S.2d 876, 551 N.E.2d 77 (1990))

See, generally, Practice Commentary. **Attorneys should notify the opposing counsel of an attempt to seek an ex parte order where**

appropriate. Failure to do so is, at the very least, unprofessional and may, in some courts, result in sanctions.
(See Frank M. v. Siobahn N, 268 A.D.2d 808, 702 N.Y.S.2d 409 (3d Dep't 2000))

By reason of the above, the Plaintiff has suffered property damage, to both real and personal property; loss of income; monetary loss; emotional injury; damage to the value of his property; anxiety; mental anguish; and has been otherwise damaged in an amount to be determined by the Court.

# WHEREFORE, the Plaintiff demands a reversal of the decisions made on all petitions and applications, including the applications EOIR-31 and EOIR-31A. See Exhibit—9, denial of EOIR applications.

The Plaintiff demands judgment against the Defendant in a sum in excess of the jurisdictional limits of all lower courts in which this action could otherwise have been brought, and in amounts to be determined upon the trial of this action, together with the costs and disbursements of this action.

Plaintiff demands judgment enjoining and restraining the defendant, Roberto Lebron, their attorneys, servants, agents, and/or employees from filing any arrest warrants with the Supreme Court of Bronx, New York or with any other Government agency for the arrest of Plaintiff. And further enjoining and restraining the defendant, Roberto Lebron, his attorney David Diamond, servants, agents, and employees from constructing or proceeding with the arrest of this Plaintiff. And, enjoining and restraining Roberto Lebron, their officers, servants, agents or employees, from conducting or operating or using the aforementioned office, located at 1428 Zerega Avenue, Bronx, New York 10462, for or as a place of investigation, and that Plaintiff have such other and further relief as to the court may seem just and proper, together with the costs and disbursements of this action.

MOREOVER, the Plaintiff moves this court to vacate the motions and orders in the Matter of NYS v. RIVERA, 1576/2004. NY. C.P.L.R. 2221(a); 257 U.S. 312 (1921) Truax v. Corrigan; 257 U.S. 329; CPLR Rule 2221; Fifth Amendment of the Constitution of United States of America. Chambers v. Florida (1940) "the basic principle that all people must stand on an equality before the bar of justice in every American court."

Dated: August 7, 2019
Bronx, New York

Edwin Rivera, Pro Se
Attorney for Plaintiff
1428 Zerega Avenue
Bronx, NY 10462
PH: 718-863-1300
FAX: 718-863-4877
Email: rivera10462@outlook.com

cc: **(via email and First Class Mail)**

New York State Attorney General Office,
Attn: David Diamond, Attorney for Defendant (LEBRON)
28 Liberty Street
New York, New York 10005
Telephone: (212) 416-8476
Facsimile: (212) 416-6009
Email: David.diamond@ag.ny.gov

United States Attorney
Southern District of New York
Attn: Joshua E. Kahane, Attorney for Defendant (USCIS)
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2699
Facsimile: (212) 637-2786
E-mail: Joshua.kahane@usdoj.gov

=======================================================================

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

Edwin Rivera

      Plaintiff,

        v.

United States Citizenship and
Immigration Service,
District Director: Thomas Cioppa
New York State Attorney
General,
Roberto Lebron, AAG
      Defendant(s)

### AFFIDAVIT IN SUPPORT
### AMENDED COMPLAINT

Civil Action No. 19 CV 03101

**EDWIN RIVERA, being duly sworn, deposes and says:**

1. That I am the Plaintiff in the above-entitled proceeding.

2. That I have a good claim because of the following events which show a sustained campaign of harassment and retaliation against me by the Defendants mentioned earlier, and at the hands of Roberto Lebron, New York State Assistant Attorney General.

1

3. That I contend that Mr. Lebron, the Assistant Attorney General (AAG), instituted the actions against me because I commenced an action against Ronald Klar, a friend of Mr. Lebron's, in a RICO matter in Federal Court.

4. **I further contend that Mr. Lebron knew me to be an accountant before his appointment as an Assistant Attorney General.** Mr. Lebron disliked me because I was requested to audit the books of the Puerto Rican Bar Association (PRBA). Mr. Lebron, who was an officer of the PRBA at that time, refused to hand over the books and documents so that I could complete the audit.

5. That the primary allegation levied against me in Mr. Lebron's action against me was that I held myself out as an attorney. Defendants alleged that advertisements that labeled me as "Licenciado" were substantial evidence of this. However, Mr. Lebron knows that the word "abogado" is the correct term for an attorney in Spanish, not "Licenciado" as Defendants claim. Accountants and plumbers are "Licenciado" in Spanish other countries.

6. That I continue to deny this allegation because I had per diem attorneys doing the legal work in my office.

7. That on May 6, 2005, the Court (Stinson, J.) granted permanent injunctive relief, restitution, penalties, and cost against me. On June 14, 2005, I received a letter from AAG with Notice of Settlement of Order and proposed Judgment and Order attached. I state that the Order was defective, and that the restitution amounts in proposed judgments were incorrect, I did not owe money to anybody, there were no claimants. Also, I maintain that the Order was issued without allowing me to challenge the evidence or AAG and his witnesses (if any).

8. That on October 19, 2005, AAG filed Judgment and Order enjoining me from engaging in any fraudulent, deceptive or illegal acts, and ordering me to pay restitution that I allegedly defrauded. First, I never defrauded anybody, ever. Second, the restitution amount stated in the Order was incorrect, $24,331. Third, I don't have the money they asked for.

9. That on or about January 3, 2006, I learned that I had contracted Bell's palsy, a condition that causes the facial muscles to weaken or become paralyzed. Bell's palsy was a significant factor that hindered me in my attempts to perfect my appeal.

10. That on August 3, 2006, I filed a letter of complaint with the New York State Inspector General (NYS OIG) concerning corruption, fraud,

criminal activity, conflict of interest, and abuse in State Government. The letter contends that Mr. Lebron, while in charge of the PRBA account books, was responsible for fraudulent accounting records and $90,000 that was unaccounted. Also, Mr. Klar was responsible for fraudulent entries concerning the closing statements of a real estate transaction which totaled $80,000, where I was the victim of such fraud. My complaint also stated that Telemundo 47 was induced or acted under the direction of Mr. Lebron.

11. That on September 12, 2006, I filed a Notice of Extension of Time. The extension was filed to allow me time to perfect my appeal. The extension request was filed due to my medical condition at the time – Bell's Palsy. The request was denied on November 16, 2006.

12. That on June 5, 2007, I received a letter from Mr. Lebron, on behalf of the Attorney General's Office, stating that I had failed to comply with the Judgment and Order of October 19, 2005. Mind you, my attorney was [never] notified to appear for that hearing, or [*any discussion*]. Also, the letter states that if I did not comply with the Judgment and Order by June 16, 2007, a mere ten days afterward, the Attorney General's Office will file a motion of contempt against me.

13. That on August 20, 2007, after negotiations, the AAG stated that they would agree to consent order instead of the filing of a contempt motion if I would consent to end my immigration service provider's business immediately permanently, provide a true and accurate accounting, and full restitution to consumers. The amount quoted by the Attorney General's Office, regarding restitution, was $46,620. This figure is now more than twice the amount that I was initially ordered to pay by the Court. Also, this amount was to be paid over the course of 90 days, with monthly payments of $15,540.

14. That this new restitution amount was determined without following the criteria outlined in the original Judgment and Order. The Judgment and Order stated that I was required to make full restitution to any other consumer "who files a complaint with the office of the Attorney General or other consumer protection agency on or before December 31, 2005". No other consumer made a complaint before this date, making the new inflated restitution amount arbitrary and capricious. This is a further example of the campaign of harassment that is now augmented by the Attorney General's Office at the behest of Mr. Lebron.

15. That to date, the AAG has yet to file a motion for contempt against me. This is yet another example of the Attorney General's Office attempting to prolong the case against me. The reason for this delay is to let the AAG continue to build a case against me. This is harassment. This is being done by forcing illegal immigrants into giving statements against me. The Defendants are gathering these statements from a position of power, knowing that these immigrants are fearful of the consequences of not cooperating with the AAG.

The immigrants are threatened with deportation. Take for example, on or about July 29, 2019, while we are waiting for the litigation of the petitions (19 CV 03101), the Attorney General came out in the media because she said that she is working on another option to arrest this Plaintiff. See Fifth Amendment to the U.S. Constitution.

16. That the Defendants will only be satisfied when they have financially ruined me, and that the Attorney General's Office has repeatedly placed

barriers to any amicable settlement. This includes the failure of the Defendants to approve the EOIR-31 and EOIR-31A. It consists of the failure of the Defendants to file a motion for contempt and the continuing buildup of false evidence even though the deadline for such evidence expired on December 31, 2005.

17. That it has now reached a point where the Attorney General's Office is being belligerent in their attempts to put me out of business. I am afraid that I cannot make the restitution payments (for something I don't owe) if I cannot even earn a livelihood in our accounting business.

18. That I further contend that because of the bad blood between Mr. Lebron concerning events that occurred before he began working in the Attorney General's Office and me, he should never have been allowed to pursue this retributive and harassing case against me. This is quite clearly a conflict of interest on Mr. Lebron's part and calls into question the independence of the whole investigation.

19. That on February 16, 2017, I was arrested at my office without an arrest warrant, and without probable cause, as a continuation of 1576/2004. Fifth Amendment violation. Hundreds saw the arrest while they were going to work or school.

**20.** That on June 8, 2017 – See Court of Claims, Index No. 129674, RECORD, transcript of the recording left by this AAG's office. The AAG is confrontational in their attempts to put me in prison, acting maliciously and sadistically.

DATED: August 7, 2019

Edwin Rivera, Affiant

STATE: NEW YORK

COUNTY: BRONX

Sworn before me this 7th day of August 2019.

MICHAEL MORALES
Notary Public, State of New York
No. 01MO6057798
Qualified in Bronx County
Commission Expires April 28, 20 13

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Edwin Rivera
(a/k/a Edwin Rivera Hernández)
, et al

      Plaintiff(s),

    v.

United States Citizenship and
Immigration Service,
Barbara Owlett, Director

    Defendant(s) *, ET AL*

**EXHIBITS**

*AMENDED
COMPLAINT*

Civil Action No. _19 CIV 03101_

Exhibit- 1, pictures on our website

Exhibit- 2, website

Exhibit- 3, letter of determination from the IRS

**Exhibit- 4, arrest of 1993, affidavit**

Exhibit- 5, Rivera vs. NYS AG

Exhibit- 6, contract with customers, as required by law

Exhibit- 7, bond required by law

Exhibit-8, Juan Collado {intent] to deny

***Exhibit-9, OLAP denial letter.***

**Exhibit-9A, *Request for reconsideration***

Exhibit-10, from part 2 of our mailing to USCIS

**Exhibit-11, In Tiny Courts of N.Y., Abuses of Law and Power, by William Glaberson, Sept. 25, 2006.**

# Case Is On Hold Because Of Pending Litigation

On May 1, 2019, we placed your Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, Receipt Number WAC1890393152, on hold because there is pending litigation that may affect the outcome. We will start working on your case as soon as the litigation is resolved. If you move, go to www.uscis.gov/addresschange (https://egov.uscis.gov/coa/displayCOAForm.do) to give us your new mailing address.



**Enter Another Receipt Number**  ?

CHECK STATUS

**RELATED TOOLS**

# EXHIBIT-1















# EXHIBIT-2

# www.hbpreligiousprogram.com



An affiliation with Christian Ministry of Family Integration, Inc., is a Christian, Evangelical, Pentecostal, and cooperative communion, formed by every person who has accepted, recognized, and confessed Jesus Christ as the only and sufficient personal savior, supported by mutual agreements voluntarily adopted.

...eligious Program
...o teach people how to pray.

...s hear from veterans who have special needs.
...be a friend to people with special needs.
3.    To bring much-needed household goods to them
4.    To bring much-needed food on a regular basis.
5.    To pray and read from the Bible with them.
6.    To teach about the life of Jesus Christ.
7.    To talk about the Holy Trinity, and how they can join us.

Thousands of people are committing suicide because of lack of attention. Veterans are no exemption. Our government is not prepared to help each veteran. For that reason, we need to pray with our veterans. Veterans belief our leaders are jealous of them.

We ask you to help us in this important endeavor. If we had the proper funding, we can help thousands of patients who visit the Veteran Administration Hospital, Bronx, New York.

# EXHIBIT-3

 **IRS** Department of the Treasury
Internal Revenue Service
P.O. Box 2508
Cincinnati OH 45201

In reply refer to: 0752258385
Aug. 08, 2018 LTR 4168C 0
13-3890499 000000 00
00047214
BODC: TE



HOMEWARD BOUND PROGRAM
% EDWIN RIVERA
1428 ZEREGA AVE
BRONX NY 10462-5410

005912

       Employer ID number: 13-3890499
       Form 990 required:   Yes

Dear Taxpayer:

We're responding to your request dated July 30, 2018, about your
tax-exempt status.

We issued you a determination letter in October of 1998, recognizing
you as tax-exempt under Internal Revenue Code (IRC) Section 501(c)
(3).

We also show you're not a private foundation as defined under IRC
Section 509(a) because you're described in IRC Sections 509(a)(1) and
170(b)(1)(A)(vi).

Donors can deduct contributions they make to you as provided in IRC
Section 170. You're also qualified to receive tax deductible bequests,
legacies, devises, transfers, or gifts under IRC Sections 2055, 2106,
and 2522.

In the heading of this letter, we indicated whether you must file an
annual information return. If you're required to file a return, you
must file one of the following by the 15th day of the 5th month after
the end of your annual accounting period:

     - Form 990, Return of Organization Exempt From Income Tax
     - Form 990EZ, Short Form Return of Organization Exempt From Income
       Tax
     - Form 990-N, Electronic Notice (e-Postcard) for Tax-Exempt
       Organizations Not Required to File Form 990 or Form 990-EZ
     - Form 990-PF, Return of Private Foundation or Section 4947(a)(1)
       Trust Treated as Private Foundation

According to IRC Section 6033(j), if you don't file a required annual
information return or notice for 3 consecutive years, we'll revoke
your tax-exempt status on the due date of the 3rd required return or
notice.

You can get IRS forms or publications you need from our website at
www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676).

If you have questions, call 877-829-5500 between 8 a.m. and 5 p.m.,

# EXHIBIT-4

 12/01/2017



Doc #122

U. S. DISTRICT COURT
FILED
SEP - 8 1997
S. D. OF N. Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES
                                  93 Cr. 568   (CSH)

      -against-
                                         ORDER

EDWIN RIVERA,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HAIGHT, Senior District Judge:

On April 20, 1995, Edwin Rivera pled guilty to a superseding information charging him with conspiracy to violate certain provisions of federal immigration law. Following an unsuccessful motion to withdraw his plea, Rivera was sentenced to time served and two years of supervised release. Rivera's term of supervised release expires on December 4, 1997.

By letter dated August 4, 1997, Rivera asks the Court to reopen his case and grant him a trial on the ground that he was working as an undercover FBI agent when he was arrested for violating federal immigration laws, and is innocent of the crimes charged. I have already rejected this argument, asserted in Rivera's motion to withdraw his plea, in an opinion dated September 22, 1995. There is nothing in Rivera's most recent letter that prompts me to re-visit my earlier conclusion.

Rivera's letter also alleges that an FBI agent has violated his civil rights by revealing information from his FBI file to the public. However, this Court's jurisdiction extends only to the

A CERTIFIED COPY
RUBY J. KRAJICK, CLERK

BY _____
          Deputy Clerk

1

MICROFILM
SEP - 9 1997   9:00 AM

above captioned criminal matter. If Rivera wishes to initiate a civil rights claim against this agent, he must file a civil complaint. The Clerk of the Court will then assign the case randomly to a judge of this court.

It is SO ORDERED.

Dated:    New York, New York
          September 8 , 1997

                              CHARLES S. HAIGHT, JR.
                                   U.S.S.D.J.

1          THE COURT:  Then I will make an observation or

2     two.  I have thought about what I am about to say.  I did

3     not say it yesterday and reflected over the night about it

4     because I think that is the better way to proceed.

5          But I am bound to say at the conclusion of this

6     hearing that if there are clearly bizarre and incompetent

7     aspects of this case, they lie in the government's conduct

8     of this case.

9          This is why I say that:  I think it was apparent

10    from the Court's reaction to the first letter received from

11    Mr. Rivera that I was concerned with whether or not he was

12    delusional; with whether or not he had been meeting with INS

13    agents; with whether or not he had been meeting with FBI

14    agents; with whether or not he was hosting conferences at

15    the Waldorf at which representatives from the State

16    Department and other agencies came.

17         I don't think anyone involved in this case could

18    have gotten any impression from me and my concerns and my

19    responsibilities other than a concern that this was all made

20    up and there was no truth to it.

21         It is because I had that concern -- manifest it

22    seems to me to everyone -- that I asked for an evaluation to

23    be made at Butner.  It is because those concerns were

24    reinforced and burst again into flame by what this witness

25    said at MCC that I ordered a further evaluation at

A CERTIFIED COPY
RUBY KRAJICK CLERK

BY

Deputy Clerk

SOUTHERN DISTRICT REPORTERS (212) 791-1020
SAMUEL G. MAURO

1    Rochester. A lot of time has gone by and a lot of

2    taxpayers' money has been spent as the Court, based upon its

3    own concerns that this was all being made up, had these

4    evaluations done.

5            Partway through the hearing yesterday I learned

6    for the first time from the government that, yes, in fact,

7    there were meetings between Mr. Rivera and INS agents; that

8    the government is not in a position to say that there were

9    no meetings with FBI agents; that the government

10   acknowledges that a State Department representative went to

11   the Waldorf-Astoria meeting.

12           All of this I learned from the government for the

13   first time yesterday, and I don't understand it. I simply

14   don't understand it. This is knowledge which was known to

15   the government from the beginning of the case. It is

16   knowledge which, as Ms. Davies has just brought out in her

17   examination of this witness, would have been of use to

18   examining physicians and psychologists, and certainly it

19   would have been of use to the Court in deciding what kind of

20   potential problem was here and what my responsibilities

21   required me to do in response to it.

22           So it emerges belatedly and casts a different

23   aspect upon the case. And I cannot, for the life of me,

24   understand why I hear about this for the first time

25   yesterday. I am giving you only my present inclinations and

1    views.

2         I will, of course, give the government an

3    opportunity to respond to these inclinations and views, and

4    it need not be at this hearing.  It may be at a later time.

5    I will consider whatever is said in deciding whether or not

6    to call this record to the attention of the United States

7    Attorney for this district.

8         But there is no question about the circumstance

9    that we presently find ourselves in, learning for the first

10   time, as I learned, that what I was concerned was a delusion

11   over all of this time and testing may in part be true.  I

12   shouldn't have had to have learned that for the first time

13   yesterday.

14        Where do we go from here?

15        The first point I want to make is that I am not

16   prepared to rule at the end of this hearing on the issue of

17   competence.  There are remaining concerns, as far as I'm

18   concerned, but my eventual evaluation of those concerns has

19   been altered by what I learned for the first time yesterday.

20   It clearly must be taken into consideration in the

21   competency calculus for the very reasons that Ms. Davies,

22   having said nothing to the Court about all of these contacts

23   for a year, elicited from Dr. Kucharski on

24   cross-examination.

25        I think -- and these are my inclinations -- that

1    I must now do two things, and I am going to throw these out

2    as inclinations and then let counsel comment on it because

3    my present inclination is to require a further contribution

4    from the government and also from the defense.

5              From the government I am inclined to require that

6    the government furnish an affidavit stating in detail each

7    and every contact that it is aware of between Mr. Rivera and

8    any agency of the United States or any representative of

9    such agency.  I include the INS; I include the State

10   Department; I include the FBI; I include any agency.  I want

11   an itemized affidavit of when each such meeting took place,

12   who the agent or agents were, the location of the meeting,

13   the substance of any conversations insofar as the government

14   is aware of it, whether it was in person or in telephone,

15   all details.

16             As to what Ms. Davies said yesterday about the

17   government not being in a position to confirm or deny

18   whether there were FBI contacts, I do not accept that.  A

19   stronger and better effort is going to have to be made, and

20   the affidavit must set forth in detail what was done in

21   pursuing this particular subject.

22             Dr. Simcox from Minnesota yesterday said that he

23   conducted such an inquiry and came up with the name of an

24   agent named Young in the FBI at 26 Federal Plaza, I think he

25   said.  The government, if it wasn't aware of that name

1    before, might use that as a useful starting point.  Things

2    have been said by this defendant about FBI contacts, and I

3    want much more effort to be devoted by the government to

4    determine whether or not any contacts with the FBI occurred.

5    So that is the kind of affidavit I want from the government.

6             From the defendant -- and this is an unusual

7    request, but it seems to me it lies at the heart of what

8    we're about here.  And Dr. Kucharski's testimony was of use

9    to me on this point as well -- I want an offer of proof as

10   to what the defense in this case is going to be.

11            There are two people who can contribute to that

12   venture:  Mr. Rivera and his very competent trial attorney.

13   But if there is a difference of opinion, as sometimes arises

14   between defense and counsel, as to what the defense should

15   be and will be, then in the particular circumstances of this

16   case I give the final power of editing and vetoing to Mr.

17   Rivera.  He is the defendant.  The charges are against him,

18   and I am going to require an offer of proof to which the

19   defendant subscribes as to what the defense will be at

20   trial.

21            If it is the present intention of the defendant

22   to take the stand, I want an offer of proof as to what he

23   will say.  If it is the defendant's present intention to

24   call witnesses on his behalf, I want those witnesses to be

25   described -- not named, but described -- and their expected

1    extent this helps you at all, that I did not perceive the

2    Court's view of this matter clearly until yesterday when I

3    was hearing the court put questions to Dr. Owens.

4              THE COURT:  I respect your First Amendment right

5    to say that Ms. Davies.  If you wish to make any further

6    comments, I would leave that entirely up to you.

7              Any further suggestions of counsel?

8              MS. BARRETT:  None, your Honor.

9              THE COURT:  Everyone understands what I expect.

10   They should be submitted and filed in camera without service

11   not later than -- what date did you give me?

12             MS. DAVIES:  December 14.

13             THE COURT:  Is that acceptable to the defense?

14             MS. BARRETT:  That is fine, your Honor.

15             THE COURT:  I will await your papers.  This

16   hearing is concluded.  Decision is reserved.  The defendant

17   is remanded.

18             (Proceedings concluded)

19

20

21

22

23

24

25

1    testimony to be summarized.

2          When I examine these two documents from the

3    government and from the defense and look at them side by

4    side and reflect on them in the light of the psychiatric and

5    psychological evidence I have heard, then it seems to me I

6    am going to be in a much better position to understand;

7    first, the extent and degree to which there may be a

8    delusion at loose here; secondly, the extent to which that

9    delusion may impact upon the defense of the case; and,

10   third, the need for further medical evaluation by a forensic

11   psychiatrist.

12         I was thinking about the advisability of a

13   reference by the court to a forensic psychiatrist not

14   employed by the Bureau of Prisons before this hearing began.

15   I hadn't decided whether to do it or not.  I was just

16   thinking about it.  Given the revelations of yesterday, it

17   does not seem to me proper to make a reference to a forensic

18   psychiatrist for an evaluation because we don't know the

19   extent to which there may be elements of arguable truth in

20   what Mr. Rivera has been saying.

21         I say, "We do not know."  Let me rephrase that

22   and say that none of us except Ms. Davies knows, but she

23   hasn't told us.  It is time she did.  Until she does and

24   until I have a better appreciation of the intended defense

25   in this case, I am not in a position to do my job, and a

1     forensic psychiatrist, in my view, is not in a position

2     fully to evaluate the case if that is what at the end of

3     this process I decide to do.

4          I want this documentation within 30 days, and the

5     presentations should be submitted to the court in camera,

6     and I will seal them and consider them in the first instance

7     at least without counsel being aware of what the other

8     side's presentation has been.

9          I may reach a conclusion that a time will come

10    when it will be necessary for me to release them from seal.

11    But in the first instance at least, these presentations

12    shall be submitted in camera and without service upon the

13    other side.  Those at least are my reactions to what has

14    happened in this hearing and my present intentions as to

15    what to do about it.

16         Counsel need not comment on it now.  You may

17    simply say, very well, that's what we'll do.  You may

18    comment on what I have said and other aspects of it at a

19    later time if you wish.

20         MS. BARRETT:  Your Honor, Mr. Rivera would like

21    to speak to the court.

22         THE COURT:  Yes, Mr. Rivera.

23         THE DEFENDANT:  Your Honor, I have, I have asked

24    the court many, many times to let me out on bail because I

25    know that if I go home, I could bring back a lot more

1    information and even information that the government knows.

2    The government knows of five FBI agents, five FBI --

3            THE COURT:  If this is an application to be

4    released on bail, I deny it.

5            Counsel?

6            THE DEFENDANT:  There is no way --

7            THE COURT:  Have counsel any comments with

8    respect to what I have said?

9            MS. DAVIES:  Your Honor, the court has set this

10   matter down for submission by the parties within 30 days.  I

11   take it that is December 14?

12           THE COURT:  Whatever.

13           MS. DAVIES:  I don't think that it would advance

14   the ball at this point for me to comment on how I or the

15   government differs with the court's perception of when it

16   was that the government should have brought this to the

17   Court's attention.  I do think that, given the tenor of the

18   Court's response, that I do want your Honor to know that,

19   however obtuse this may have been on my part, I didn't get a

20   clear view of the Court's belief that there was no element

21   of truth to Mr. Rivera's claims until yesterday when I heard

22   the questions coming from your Honor to the first witness.

23           Now, your Honor may have a difficult time

24   understanding that, but I might remind you that this was the

25   first time that we actually came to a hearing, a competency

1    hearing in the case, notwithstanding the fact that we had a

2    number of evaluations of Mr. Rivera's competency, and there

3    are certain letters even that the government has not been

4    privy to that Mr. Rivera has sent to the court that I have

5    not had an opportunity to review.  And I certainly wasn't

6    under the impression that the Court was reading those

7    documents with the belief that there was no element of truth

8    to Mr. Rivera's claims.

9            I did not get that sense from the Court until for

10   the first time yesterday.  And it crossed my mind frankly,

11   your Honor, when I heard the questions that you were putting

12   to the first witness that I was faced with doing one or two

13   things:  Either interrupting the Court's questions to the

14   witness at that time, or making a proffer after the first

15   witness got off the stand.

16           I know that the court may have a different view.

17   I just wanted, given the tenor of the Court's concern here,

18   to at least put that on the record.  I'm certainly willing

19   to submit further statements to the Court about that if the

20   Court is at all concerned further with my conduct.

21           I certainly intend to bring the Court's concerns

22   to the attention of the U.S. Attorney myself so that the

23   U.S. Attorney is aware of the Court's concerns about the

24   disclosure of this information, and the timeliness of the

25   disclosure.  But I did want to say to your Honor, to the

# Records Center Retrieval Form

Peter 120

## NOTICE

*You will be notified once the file(s) have been received from the Records Center. The file(s) will held at the courthouse for five (5) business days from the date of notification. Once you have reviewed the file(s) or five (5) business days have elapsed the file(s) will be returned to the Records Center.*

Date: 11/27/17

Case Number: 93 Cr 568

Case Number: _____

Accession: 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

Accession: _____

Box(s): 5

RECEIVED
NOV 27 2017
U.S.D.C. S.D. N.Y.
CASHIERS

Box(s): _____

Accession: _____

Accession: _____

Box(s): _____

Box(s): _____

Records Center Retrieval Fee - $64.00 First Box ( ✓ )
$39.00 Each Additional Box ( )

Total Fee: 6400

## PLEASE PRINT CLEARLY

Name: EDWIN RIVERA

Firm Name: _____

Address: 1428 ZEREGA AVE., BRONX, N.Y. 10462

Signature: _____

Tel: 718-863-1300

OFFICE USE ONLY:

By: _____

Date Ordered: _____

# AFFIDAVIT-A

# UNITED STATES vs. INS EMPLOYEES

## AFFIDAVIT IN SUPPORT
### On Request for Reconsideration of denial, November 13, 2017
(Under [EOIR Docket No. 176; A.G. Order No. 3783-2016]
RIN 1125-AA72)

**EDWIN RIVERA**, being duly sworn, deposes and says:

1. I am the party named as the applicant in the above-entitled request.
2. I have a good claim for the accreditations requested.

3. On or about February 1990 a crime was reported to me at the INS office.

4. I was at the INS with clients of John J. Montes, Attorney at Law, he sent me that day to accompany his clients while they were submitting their applications at the counter. They were applying for benefits under the Late Amnesty.

5. I reported the crime to the FBI in March 1990. The Agent asked me for identification, and I told him that I was an accountant.

6. I told the Agent that a lady came up to me at the INS with about thirty-five (35) immigrants complaining that she refuses to pay fifteen hundred dollars ($1,500) for each of her customers who were trying to receive the Employment Authorization Document (EA). Furthermore, she said that she was paying a Dominican man who was paying the Supervisor the

1

money. She said that she was angry because the customers did not have the money and now they were going home without the card. I told the lady that I will try to see how I was going to help her. I also told the Agent that I discussed the issue with COPS that were friends, and they said that the problem had to with the FBI.

7. I contend that the FBI asked for my assistance while investigating a crime reported by this applicant, on or about March 15, 1990. He asked me to find "dirty" information about the Dominican.

8. The attorney in our office, John J. Montes, overshadowed the preparation of the forms prepared for the customers. He told me that it was my duty to help the FBI.

9. On or about April 17, 1990, I learned from people in the Bronx, our community, and Upper Manhattan, that the Dominican related to the ferry that came from the Dominican Republic to Puerto Rico before 1988.

10. I purchased airline tickets on or about April 18, 1990. Left early in the morning to Puerto Rico to return the next day. When I got there around noon, I quickly took a taxi to Ports and Terminals main office. When I got there, an employee asked me why I came. I told him that I wanted to see the list of people who entered from the Dominican Republic and how they managed to enter Puerto Rico. He called the supervisor, and he asked me for identification, and I gave him the original business card the FBI Agent had given me. He took a photocopy of the front and back of the card, and I told him to give me the photocopies. He stapled the two, and I put them

in my wallet.

11. I learned that the ferry crashed on or about February 24, 1988, and it was the last time it could dock in Puerto Rico. I also learned that the only document the passengers needed was the birth certificate and the passport.

12. I left for San Juan around 4 P.M. arrived and started looking for a hotel to stay for the night. I found the hotel, had dinner and was in bed around 11 P.M. Got up the next morning around 4 A.M. to have breakfast and run to the airport.

13. At the airport, the INS inspector asked me for identification, and he saw the copy of the business card of the Agent. She asked me who the Agent was and I told her that I was collecting information for the Agent. She asked me if I was doing work for the FBI. I told her yes. She then had me detained, and she called the FBI in Puerto Rico.

14. This saga kept me on the island for one week until the Federal Magistrate dismissed the charges, impersonation of a federal agent.

15. I was bailed out by my mother.

16. The FBI Agent who took my personals, kept them in his car because he figured that I was going to be released and sent back to New York.

17. Back in New York, on or around April 25, 1990, I told the Agent what had happened.

18. To gain access to more information, I finally moved to 1133 Broadway, 6th Floor, New York City, May 1, 1991.

19. The information about the activities at the INS were pouring. It was not

just Hispanic immigrants involved. It was Indian, Pakistanis, and Columbians. Every group dealing Hash, Heroin, and Cocaine.

20. My search for creditable information was worldwide.

21. I traveled to India to find out how they enter illegally.

22. I found out that Pakistanis enter under cover of Indian Nationals. Passports are sold with your picture and all the details. Some Pakistanis place an order for more than twenty passports for his people, and the documents are prepared in about ten days.

23. They traveled to England, and there they went to the Bahamas.

24. From the Bahamas on speedboats at 1 A.M. they traveled to Florida.

25. With a stomach full of heroin capsules made from plastic gloves they drop the load in Florida and bring it the North East for sale in the streets.

26. I traveled to Colombia to find out how they enter illegally.

27. I found out that they purchase American Documents of children who were missing from U.S.A during the years 1975. They crossed our border file for anything involving fingerprints using the birth certificate. The prints are registered in our system with that name and become part of the mainstream with the new name. Then they apply for an American Passport. They traveled back to U.S.A. with the document. It was different back then; they were able to return with a load of cocaine or heroin in their stomach and entered undetected.

28. I traveled to the Dominican Republic to find out how they enter illegally.

29. They had something called "machete" which was documents purchased in

Colombia or Venezuela, birth certificates, passports, etc.

30. I traveled to Poland.

31. Before leaving, FBI sent me a translator who traveled with me all expenses paid. Our mission was to investigate LOT, the airline.

32. We got to Poland, 1992, but we were not very successful. The Russian had just left the country, but the people had a mentality of distrust. When we got to the storage facility of LOT the lady there told us that she had the files we were looking for, but we had to return the next day. When we got there the next day, she turned on us. She said that the records were no longer available. The translator argued with her, but I told her that it was not worth it, and we left.

33. I traveled to Canada to find out how they cross the border illegally.

34. They enter through the Windsor tunnel inside trucks normally used to carry vegetables and other products.

35. Entering from Canada is relatively easy, by land, over the Washington State border on the north. And they have many other simple ways to cross the border. Is not like crossing the border of Mexico. It's a lot easier.

36. We are talking about 1992-3, crossing from Mexico was very easy. Drugs crossed our borders relatively easy. The financing of the Bombing of World Trade in 1993, I believe, came from sales made by "Curly."

37. He was the kingpin who probably paid thousands for EAs. He was always very close to INS. In New Jersey, he had many drivers in the parking area. In New York City, he purchased the candy store directly across the INS

office on 26 Street. In New Jersey, the Service had two locations: Paterson, New Jersey; Newark, New Jersey.

38. Curly had his hands in every candy store or regular grocery stores near the Service.

39. I learned about Curly and his people because they came to my office at 1133 Broadway.

40. We had a meeting with Special Agents from INS, Department of State, and IRS, June 1992, at the Waldorf Astoria Hotel in a private conference room. There a retired New York State Trooper and I open out information gathered from Colombia, Poland, India, Canada, Dominican Republic, Venezuela, Bahamas, Mexico, and the lack of services of the vital records office around the United States. A person who died before he was ten years old in a state other than the state he was born, there is no system to match the death certificate and birth certificate.

41. I traveled to Washington, D.C. to meet with Mr. Rodriguez, Chairperson of the Missing and Exploited Children. He called an FBI Agent to take part of the conversation because the findings are very important.

42. Fingerprints of children should be taken in school every year.

43. Airports need to install a fingerprint system that will confirm who the person is or is not.

44. Fingerprints of children change between the ages seven (7) and twelve (12). This means that if we don't change or update our system, we are dealing with a generation of people that are not citizens of U.S.A.

Right now, we might be dealing with people who we believe to be citizens.

_Edwin Rivera, Affiant_

**STATE: NEW YORK**
**COUNTY: BRONX**

Sworn before me came Edwin Rivera this _30_ day of November 2017.

MICHAEL MORALES
Notary Public, State of New York
No. 01MO6057798
Qualified in Bronx County
Commission Expires April 23, 20_19_

7

# EXHIBIT-5



# Court of Claims
## State of New York

Faviola A. Soto

Judge

Chambers
26 Broadway 10th Floor
New York, New York 10004
(212) 361-8160
Fax (212) 361-8165

June 26, 2017

Mr. Edwin Rivera
1428 Zerega Avenue
Bronx, New York 10462

Joseph Paterno, AAG
Office of the Attorney General
120 Broadway
New York, NY 10271

Re:    <u>Edwin Rivera v State of NY, Claim #129674</u>

Dear Counsel and Claimant:

    Please be advised that a preliminary conference in this claim is scheduled for October 6, 2017 promptly at 10:00 a.m., at 26 Broadway, Tenth Floor, New York, New York 10004. Only those who are fully familiar with the claim and fully authorized may appear. If this is an e-filed case, please continue to e-file all documents.

    There are no adjournments without advance leave of court. An adjournment may be requested by correspondence to the court setting forth the reason for the requested adjournment and whether the request is on consent or opposed: the letter shall note that a copy was provided to opposing counsel and is to be received by chambers no later than 48 hours prior to the scheduled date. Faxes should not be sent to chambers absent exigent circumstances. In the event of an emergency application, for good cause only, the request may be made by joint telephone conference arranged by the party requesting the adjournment.

    In the event of a failure to appear, appropriate relief may be granted.

Very truly yours,

Robin King
Secretary to Judge Faviola Soto

This form is unofficial and provided primarily for pro se litigants. It should be completed in accordance with the substantive pleading requirements of Court of Claims Act section 11(b).

# State of New York
# Court of Claims

_____EDWIN RIVERA_____
_____,
_____,

Claimant(s)

v.

_____NEW YORK STATE____,
_____,

Defendant(s)

## Claim

1. The post office address of the claimant (you) is 1428 Zerega Avenue, Bronx, NY 10462

2. This claim arises from the acts or omissions of the defendant. Details of said acts or omissions are as follows (be specific): February 16, 2017 – Attorney General had me arrested at my office without probable cause then took me to Rikers Island before taking me to 125 White Street, New York, NY, Detention Center. I was arrested at my office at or around 8:00 A.M. and was released Saturday, February 18, 2017, at or around 8:00 A.M.

February 9, 2007 to February 22, 2007 - Attorney General had me arrested in Dominican Republic without probable cause.

May 2007 – Attorney General provided newspapers in Puerto Rico with details of my medical record to discourage those applying for the H-2A Visa.

May 2005 to November 2011 – Attorney General, in violation of the due process, had me arrested several times with false charges never explored in Court.

All the acts of the defendant have been in retaliation after claimant conducted an audit of the books of the Puerto Rican Bar Association. It was discovered that the father of Roberto Lebron, Junior, Assistant Attorney General, misappropriated funds of that organization, $90,000.00. All the acts have also been after it was discovered that Ronald Klar, Attorney at Law, and Gerald Esposito, Judge, friends of Roberto Lebron, Junior and Senior, were discovered after committing real estate fraud and election fraud.

3. The place where the act(s) took place is (be specific): 1428 Zerega Avenue, Bronx, New York 10462



# Court of Claims
## State of New York

ROBERT ABRAMS BUILDING FOR LAW AND JUSTICE
BOX 7344, CAPITOL STATION
ALBANY, NEW YORK 12224

**Richard E. Sise**
Acting Presiding Judge

**Eileen F. Fazzone**
Chief Clerk

June 15, 2018

New York State Dept. of Law
The Capitol
Albany, New York 12224
Attn: Assistant Attorney General Bryant

   **Re: EDWIN RIVERA**
     **Claim No. 129674 Motion No. M-91953, & CM-92130**

Dear Counsel:

    In connection with the above numbered and entitled motion(s), enclosed please find:

✓   two conformed copies of Decision and Order (one paper)

_____one certified and two conformed copies of Decision and Order (one paper)

_____two conformed copies of an Order

    You are required to serve a copy of the above document upon all appropriate parties.

               Very truly yours,

               Eileen F. Fazzone
               Chief Clerk

               Motion Unit
               (518) 432-3416

ehm
enc.
cc: Edwin Rivera, Pro Se
    1428 Zerega Avenue
    Bronx, NY 10462
    (w/attachment)

COURTESY COPY

STATE OF NEW YORK      COURT OF CLAIMS

EDWIN RIVERA,

                                Claimant,        **DECISION AND
                                                  ORDER**

                -v-

THE STATE OF NEW YORK,

                                                 Claim No.     129674
                                                 Motion Nos.   M-91953
                                                               CM-92130

                                Defendant.

FILED

JUN 1 5 2018

STATE COURT OF CLAIMS
ALBANY, N.Y.

BEFORE:        **HON. FAVIOLA A. SOTO**
               **Judge of the Court of Claims**

APPEARANCES:   **For Claimant:**
               **Edwin Rivera, *Pro Se***

               **For Defendant:**
               **Hon. Barbara D. Underwood, Acting Attorney General of
               the State of New York**
               **By: Janet L. Polstein, AAG**

This action arises out of claimant's arrest that was allegedly directed by the Attorney General's office on February 16, 2017. Claimant now moves to amend his claim. Defendant opposes claimant's motion and cross-moves to dismiss the claim in its entirety. Claimant did not oppose defendant's cross-motion.

The following papers were reviewed in deciding the motion and cross-motion:

    1. Claimant's notice of motion and affidavit in support with exhibits; and

2. Defendant's notice of cross-motion and affirmation in opposition to claimant's

motion and in support of the cross-motion with exhibits.


## ANALYSIS

Defendant's Cross-Motion Seeking Dismissal is Granted:

Since defendant's cross-motion seeks dispositive relief, it is analyzed first. In deciding a

motion to dismiss pursuant to CPLR 3211, the Court's role is ordinarily limited to determining

whether the claim states a cause of action. *See Frank v DaimlerChrysler Corp.*, 292 AD2d

118,[1st Dept 2002]. The Court must accept the facts as alleged in the claim as true, accord

claimants the benefit of every possible favorable inference, and determine only whether the facts

as alleged fit into any cognizable legal theory. *See Leon v Martinez*, 84 NY2d 83, 87-88 [1994].

In this context, the pleadings  must be liberally construed. *See* CPLR 3026.

Generally, prosecutors are not entitled to absolute immunity from liability for all of the

actions they take in their official capacity. The immunity accorded them is qualified, and in

determining whether and to what extent a prosecutor's actions are protected, the court must

analyze the prosecutor's "functions and duties" and the scope of his or her discretion. *See*

*Arteaga v State of New York*, 72 NY2d 212, 216 [1988]. Prosecutors are entitled to absolute

immunity from liability from civil claims when their actions involve judicial or quasi-judicial

functions. *See Drakeford v City of New York*, 6 AD3d 302, 303 [1st Dept 2004]. A prosecutor's

actions taken in connection with the initiation of a prosecution or presenting a case at trial are

quasi-judicial functions and thus entitled to absolute immunity. *See Cunningham v State of New*

*York*, 71 AD2d 181, 182 [3d Dept 1979]. Where prosecutors are not acting in that capacity but,

instead, performing investigative or administrative functions, they are entitled to only qualified immunity and may be held liable for actions taken in bad faith or that violate clearly established statutory or constitutional rights. *See Hirschfeld v City of New York*, 253 AD2d 53 [1st Dept 1999].

Here, claimant alleges that he was falsely arrested on February 16, 2017 based on an Assistant Attorney General's personal animus against him. In his claim, claimant describes a long history of prior arrests, some of which he claims were retaliatory. In its cross-motion to dismiss, defendant contends that the Attorney General's office did not direct claimant's arrest on February 16, 2017. Defendant made a similar argument in a pre-answer motion to dismiss, which the Court denied. Unlike their prior motion which was not supported by an affidavit of someone with personal knowledge of the underlying facts, defendant supported their cross-motion with the affidavit of Roberto Lebron, the Assistant Attorney General in Charge of the Harlem Regional Office. AAG Lebron details his office's history of prosecuting claimant and eventually seeking his arrest. AAG Lebron petitioned Hon. Betty Owen Stinson in New York Supreme Court, Bronx County, to permanently enjoin claimant from engaging in fraudulent or illegal practices. According to AAG Lebron's affidavit and exhibits attached to it, Judge Stinson found claimant engaged in deceptive acts and practices, false advertising, and improperly held himself out as an attorney licensed to practice law in New York. *See* Order dated May 6, 2005, Ex. B of Def. Aff. in Supp. Judge Stinson granted the permanent injunction, ordered claimant to pay restitution, and submit to an accounting of his clients to the Attorney General's office. *Id.* However, claimant never complied. Subsequently, Judge Stinson found claimant guilty of criminal contempt for failing to comply with her prior orders and issued a warrant for his arrest. *See* Order dated July

29, 2008, Ex. D of Def. Aff. in Supp. Thereafter, Judge Stinson issued multiple orders directing claimant's arrest.

AAG Lebron avers that claimant was arrested by the New York City Sheriff's Office on October 6, 2016, but was improperly released thirty days thereafter by the New York City Department of Corrections ("NYC DOC"). On February 15, 2017, AAG Lebron spoke to the Chief of Staff at the NYC DOC regarding claimant's early release. He learned that claimant was released early because of an error on NYC DOC's part. He then informed the Chief of Staff that he would need another warrant to secure claimant's re-arrest and asked the Chief of Staff for supporting records.

AAG Lebron further avers that he never received the supporting records he requested and was belatedly informed by the Chief of Staff that claimant was re-arrested on February 16, 2017. AAG Lebron states that the Attorney General's office did not direct claimant's re-arrest on February 16, 2017. Instead, it appears that claimant was arrested by agents employed by the City of New York.

Based on AAG Lebron's detailed explanation of the Attorney General office's lack of involvement in claimant's re-arrest on February 16, 2017, it is clear that the Attorney General's office was only involved in the prosecution of claimant's case leading up to his arrest. In this circumstance, defendant's actions do not implicate a police function that is outside the scope of prosecutorial immunity. *See Karen v State*, 111 Misc. 2d 396, 399 [Ct. Cl. 1981] (Sovereign immunity is inapplicable to a false arrest claim.). Thus, defendant's actions are quasi-judicial and entitled to absolute immunity. Considering claimant's lack of opposition to defendant's motion

and affording him every favorable inference from the facts alleged in his claim, the Court finds that claimant fails to state a cause of action for false arrest. Accordingly, his claim is dismissed.

## Claimant's Motion Seeking to Amend his Claim is Denied

Claimant seeks to amend his claim to assert three new causes of action: (1) intentional infliction of emotional distress; (2) pain and suffering; and (3) false arrest and intimidation.

As a threshold matter, claimant's first and third proposed causes of action allege intentional torts which must be brought within the one year statute of limitations governing intentional tort actions. *See* CCA § 10 [3-b]; CPLR 215[3]. Since claimant brings his motion after the statute of limitations has expired, the Court will not permit him to add claims for intentional infliction of emotional distress or a new claim for false arrest and intimidation.

Additionally, when a motion to amend a pleading is made pursuant to CPLR 3025, the amended pleading must state a proper cause of action. *See Lucido v Mancuso*, 49 A.D.3d 220, 229 [2d Dept 2008] (In reviewing a motion to amend a pleading under CPLR 3025, the Court must determine whether the proposed amendment is palpably insufficient to state a cause of action or defense, or is patently devoid of merit.) Here, claimant's proposed cause of action for pain and suffering does not state a proper cause of action against the State. Instead, it merely describes what he believes to be damages that allegedly resulted from his arrest and confinement.

## CONCLUSION

Based on the foregoing, claimant's motion (M-91953) to amend his claim is denied in its entirety and defendant's cross-motion (CM-92130) to dismiss is granted. Accordingly, it is ORDERED that claim number 129674 is hereby dismissed.

New York, New York
May 17, 2018

HON. FAVIOLA A. SOTO
Judge of the Court of Claims

COURT OF CLAIMS
STATE OF NEW YORK
GOVERNOR NELSON A. ROCKEFELLER
EMPIRE STATE PLAZA
BOX 7344 CAPITOL STATION
ALBANY, NEW YORK 12224

Edwin Rivera, Pro Se
1428 Zerega Avenue
Bronx, NY 10462

1046285410 C021

NEOPOST
06/19/2018
US POSTAGE $000.68

# EXHIBIT-6

## ACCREDITATION IN PROGRESS

Fee: $2.50/minute,
Minimum fee: $150

"immigrant assistance service providers" ("IASP")
This office is regulated by N.Y. Gen. Bus. Law §§ 460-a through 460-j and by Local Law 31, § 20-770 et seq.

OUR SERVICES

1. Clerical
2. Complete immigration forms based on information provided by the immigrant
3. Translations, according to Federal and State laws

4. We don't advertise
5. We are BONDED
6. We provide a written contract in both English and Spanish. After the payment, you can come back five (5) days later to start working on the forms.
7. We do not provide legal services or tell you what immigration relief you should seek or what immigration forms to complete and file. We simply take the forms and complete them.
8. We do not appear in immigration court or before officials of immigration.



9. We do not do referrals to another person or entity that is qualified to provide legal immigration services. We let the attorneys working with us do the referrals.

10. We must submit documentation showing that we have the knowledge, information, and experience in immigration and nationality law and procedure.

11. We are people of good moral character and will only charge or accept a nominal fee set by this organization.

12. We are not attorneys

13. We are not going to tell you what forms to complete and file,

14. We simply prepare the forms and give them to you for mailing. You are responsible for taking care of the mail, copies, and original documents.

15. If the forms become disorganized, please don't come back.

"Proveedores de servicios de asistencia a inmigrantes" ("lASP")

Esta oficina está regulada por N.Y. Gen. Bus. Ley §§ 460-a a 460-j y por la Ley Local 31, § 20-770 et seq.

NUESTROS SERVICIOS
1. Clerical
2. Completar formularios de inmigración basados en la información proporcionada por el inmigrante
3. Traducciones, de acuerdo con las leyes federales y estatales
4. No anunciamos
5. Estamos vinculados
6. Proporcionamos un contrato escrito tanto en inglés como en español. Después del pago, puede regresar cinco (5) días después para comenzar a trabajar en los formularios.
7. No proporcionamos servicios legales o le decimos qué alivio de inmigración debe buscar o qué formulario de inmigración llenar y presentar. Simplemente tomamos los formularios y los completamos.
8. No comparecemos ante el tribunal de inmigración ni ante los funcionarios de inmigración.
9. No hacemos referidos a otra persona o entidad cualificada para proveer servicios legales de inmigración. Dejamos que los abogados que trabajan con nosotros hagan las referencias.
10. Debemos presentar documentación que demuestre que tenemos el conocimiento, la información y la experiencia en derecho y

3



procedimiento de inmigración y nacionalidad.

11. Somos personas de buen carácter moral y solo cobraremos o aceptaremos una tarifa nominal establecida por esta organización.

12. No somos abogados

13. No vamos a decirle qué formularios completar y presentar,

14. Simplemente preparamos los formularios y los damos a usted para enviarlos por correo. Usted es responsable de cuidar el correo, las copias y los documentos originales.

15. Si las formas se desorganizan, por favor no vuelva.



Fecha de hoy: 9/17/18

Su nombre: Juan J Collado

Su firma: _____

El ultimo día para cancelar la orden de su trabajo:



4

Fee: $2.50/minute,
Minimum fee: $150

"immigrant assistance
service providers" ("IASP")
This office is regulated by
N.Y. Gen. Bus. Law §§ 460-a
through 460-j and by Local
Law 31, § 20-770 et seq.

OUR SERVICES

1. Clerical
2. Complete
   immigration forms
   based on information
   provided by the
   immigrant
3. Translations,
   according to Federal
   and State laws
4. We don't advertise
5. We are BONDED
6. We provide a written
   contract in both
   English and Spanish.
   After the payment,
   you can come back
   five (5) days later to
   start working on the
   forms.
7. We do not provide
   legal services or tell
   you what immigration
   relief you should seek
   or what immigration
   forms to complete
   and file. We simply
   take the forms and
   complete them.
8. We do not appear in
   immigration court or
   before officials of
   immigration.

1



9. We do not do referrals to another person or entity that is qualified to provide legal immigration services. We let the attorneys working with us do the referrals.

10. We must submit documentation showing that we have the knowledge, information, and experience in immigration and nationality law and procedure.

11. We are people of good moral character and will only charge or accept a nominal fee set by this organization.

12. We are not attorneys

13. We are not going to tell you what forms to complete and file,

14. We simply prepare the forms and give them to you for mailing. You are responsible for taking care of the mail, copies, and original documents.

15. If the forms become disorganized, please don't come back.

"Proveedores de servicios de asistencia a inmigrantes" ("lASP")

2

Esta oficina está regulada por N.Y. Gen. Bus. Ley §§ 460-a a 460-j y por la Ley Local 31, § 20-770 et seq.

NUESTROS SERVICIOS
1. Clerical
2. Completar formularios de inmigración basados en la información proporcionada por el inmigrante
3. Traducciones, de acuerdo con las leyes federales y estatales
4. No anunciamos
5. Estamos vinculados
6. Proporcionamos un contrato escrito tanto en inglés como en español. Después del pago, puede regresar cinco (5) días después para comenzar a trabajar en los formularios.
7. No proporcionamos servicios legales o le decimos qué alivio de inmigración debe buscar o qué formulario de inmigración llenar y presentar. Simplemente tomamos los formularios y los completamos.
8. No comparecemos ante el tribunal de inmigración ni ante los funcionarios de inmigración.
9. No hacemos referidos a otra persona o entidad cualificada para proveer servicios legales de inmigración. Dejamos que los abogados que trabajan con nosotros hagan las referencias.
10. Debemos presentar documentación que demuestre que tenemos el conocimiento, la información y la experiencia en derecho y

3



procedimiento de inmigración y nacionalidad.

11. Somos personas de buen carácter moral y solo cobraremos o aceptaremos una tarifa nominal establecida por esta organización.

12. No somos abogados

13. No vamos a decirle qué formularios completar y presentar,

14. Simplemente preparamos los formularios y los damos a usted para enviarlos por correo. Usted es responsable de cuidar el correo, las copias y los documentos originales.

15. Si las formas se desorganizan, por favor no vuelva.



Fecha de hoy: 09/23/2018

Su nombre: Gladis Y. Consuegra de Collado

Su firma: Gladys Collado

El ultimo día para cancelar la orden de su trabajo:



# EXHIBIT-7



# Your surety bond has been renewed and remains in full force and effect.

Your obligee, the New York City Department of Consumer Affairs, has written your bond form as "continuous until canceled." Since your renewal was finalized before the cancellation date, no further action is required from you at this time.

**This email serves as your official renewal confirmation.**

**Bond #:** 10057405

**Status:** ACTIVE

**State:** New York

**Amount:** $50,000.00

**Type:** Immigration Assistance Service Providers Bond

**Term:** 5/8/19 - 5/7/20

We appreciate your continued trust in SuretyBonds.com and look forward to working with you again at your next renewal period.

# EXHIBIT-8

March 7, 2019

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
California Service Center
Laguna Niguel, CA 92607-0590



**U.S. Citizenship
and Immigration
Services**

EDWIN RIVERA
HOMEWARD BOUND PROGRAM
1428 ZEREGA AVENUE
BRONX, NY 10462



WAC1890402085

Form I-360, Petition for Amerasian, Widow(er), or
Special Immigrant



A078-207-179

## NOTICE OF INTENT TO DENY

On September 21, 2018, Homeward Bound Program, filed Form I-360, Petition for Amerasian, Widow or Special Immigrant, with U.S. Citizenship and Immigration Services (USCIS), seeking to classify Juan Collado Tejada, as a Special Immigrant Religious Worker under section 101(a)(27)(C) of the Immigration and Nationality Act (INA or "Act").

USCIS reviewed the record of evidence in accordance with the INA and Title 8, Code of Federal Regulations (8 CFR), and determined the evidence does not demonstrate eligibility for the classification. Therefore, USCIS intends to deny the petition.

When USCIS intends to make a decision that will be adverse to the petitioner, based on information of which the petitioner is unaware, USCIS must notify the petitioner and allow a period of time for rebuttal.

8 CFR 103.2(b)(16)(i) states:

> If the decision will be adverse to the applicant or petition and is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered…

### Qualifying Position

The first issue to be discussed is whether you have established that the position offered to the beneficiary qualifies as a religious occupation.

8 CFR 204.5(m)(5) states that the religious occupation must meet all of the following requirements:

> (A) The duties must primarily relate to a traditional religious function and be recognized as a religious occupation within the denomination;

(B) The duties must be primarily related to, and must clearly involve, inculcating or carry out the religious creed and beliefs of the denomination;

(C) The duties do not include positions which are primarily administrative or support such as janitors, maintenance workers, clerical employees, fund raisers, persons solely involved in the solicitation of donations, or similar positions although limited administrative duties that are only incidental to religious functions are permissible; and

(D) Religious study or training for religious work does not constitute a religious occupation, but a religious worker may pursue study or training incident to status.

8 CFR 204.5(m)(5) further defines a Religious Worker as:

An individual engaged in and, according to the denomination's standards, qualified for a religious occupation or vocation, whether or not in a professional capacity, or as a minister.

In addition, 8 CFR 204.5(m)(7)(vi) requires the petitioner attest to the following:

The title of the position offered to the alien . . . and a detailed description of the alien's proposed daily duties;

In making a determination regarding this classification, USCIS must distinguish between activities that are traditionally performed by volunteer members of the congregation, as part of the practice of their religious beliefs, and activities that are traditionally performed by specialized personnel.

Because the terms "traditional religious function" and "religious occupation" will necessarily differ depending upon the religion and specific denomination under review, USCIS must consider each position on its individual merits.

You seek to temporarily employ the beneficiary as a Religious Worker.

On October 26, 2018 you were requested to provide the required documentation to establish position offered to the beneficiary qualifies as a religious occupation.

On January 18, 2019, you responded to the request for evidence by US Citizenship and Immigration Services (US CIS) by submitting the following:

(a) A letter from the Internal Revenue Service recognizing the petitioning organization as tax exempt under 501 (c) (3) under Internal Revenue Code (IRC):

(b) Constitution and Regulation of the petitioning organization;

(c) Program of the petitioning organization; and

(d) Duties of the beneficiary.

Determining the status or duties of an individual within a religious organization is a distinct question from determining whether that individual qualifies for status or benefits under United States

immigration laws. Authority over the latter determination lies not with any ecclesiastical body but with the secular authorities of the United States, i.e., the designated representative of the Attorney General [now Department of Homeland Security]. Matter of Hall, 18 I. & N. Dec. 203 (BIA 1982); Matter of Rhee, 16 I. & N. Dec. 607 (BIA 1978); Kleindienst v. Mandel, 408 U.S. 753, 769-70, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); Unification Church v. Attorney Gen., 581 F.2d 870, 874 (D.C. Cir.), cert. denied 439 U.S. 828 (1978).

Since the burden of proof to establish eligibility for benefits sought rests with the petitioner under section 291 of the Act, simply going on record with unsupported statements without supporting documentary evidence does not satisfy the burden of proof in these proceedings. Matter of Treasure Craft of California, 14 I. & N. Dec. 190 (Reg. Comm'r 1972).

Therefore, you have not established that the beneficiary will be working in a qualifying religious occupation.

## Two-Year Qualifying Work Experience

The second issue to be discussed is whether the beneficiary has been continuously employed as a religious worker for at least the two year period immediately preceding the filing of the petition.

8 CFR 204.5 states, in part:

(m) Religious workers -- This paragraph governs classification of an alien as a special immigrant religious worker as defined in section 101(a)(27)(C) of the Act and under section 203(b)(4) of the Act. To be eligible for classification as a special immigrant religious worker, the alien (either abroad or in the United States) must:

(2) Be coming to the United States to work in a full time (average of at least 35 hours per week) compensated position in one of the following occupations as they are defined in paragraph (m)(5) of this section:

    (i) Solely in the vocation of a minister of that religious denomination;

    (ii) A religious vocation either in a professional or nonprofessional capacity; or

    (iii) A religious occupation either in a professional or nonprofessional capacity.

(4) Have been working in one of the positions described in paragraph (m)(2) of this section, either abroad or in...the United States, and after the age of 14 years continuously for at least the two-year period immediately preceding the filing of the petition. The prior religious work need not correspond precisely to the type of work to be performed. A break in the continuity of the work during the preceding two years will not affect eligibility so long as:

    (i) The alien was still employed as a religious worker;

    (ii) The break did not exceed two years; and

    (iii) The nature of the break was for further religious training or for sabbatical...However, the alien must have been a member of the petitioner's

denomination throughout the two years of qualifying employment.

8 CFR 204.5(m)(4) specifically states that the two years of prior religious work, must be in a position described under paragraph (m)(2), of the same section. USCIS has interpreted the two-year experience provision to require full-time religious work, which is defined as at least 35 hours per week.

Further, 8 CFR 204.5(m)(11) states:

> Qualifying prior experience during the two year immediately preceding the petition or preceding any acceptable break in the continuity of the religious work must have occurred after the age of 14... If the alien was employed in the United States during the two years immediately preceding the filing of the application and:
>
> (i) Received salaried compensation, the petitioner must submit IRS documentation that the alien received a salary, such as an IRS Form W-2 or certified copies of income tax returns.
>
> (ii) Received non-salaried compensation, the petitioner must submit IRS documentation of the non-salaried compensation if available.
>
> (iii) Received no salary but provided for his or her own support, and provided support for any dependents, the petitioner must show how support was maintained by submitting with the petition additional documents such as audited financial statements, financial institution records, brokerage account statements, trust documents signed by an attorney, or other verifiable evidence acceptable to USCIS.
>
> If the alien was employed outside the United States during such two years, the petitioner must submit comparable evidence of the religious work.

The petition was filed on September 21, 2018. Therefore, you must demonstrate the beneficiary has been working continuously full-time, for the two years immediately preceding the filing of the petition, since September 21, 2016 until September 21, 2018.

Since the burden of proof to establish eligibility for benefits sought rests with the petitioner under section 291 of the Act, simply going on record with unsupported statements without supporting documentary evidence does not satisfy the burden of proof in these proceedings. Matter of Treasure Craft of California, 14 I. & N. Dec. 190 (Reg. Comm'r 1972).

Therefore, you have failed to demonstrate that the beneficiary has been working continuously for the two-years immediately prior to the filing of the present petition, in a qualifying position.

## Compliance Review

The 3rd issue to be discussed is if you have satisfactorily completed a site inspection.

The regulation at 8 CFR 204.5(m)(12) provides:

> *Inspection, evaluations, verifications, and compliance reviews.* The supporting evidence submitted may be verified by USCIS through any means determined appropriate by USCIS, up to and including an on-site inspection of the petitioning organization. The inspection may

include a tour of the organization's facilities, an interview with the organization's officials, a review of selected organization records relating to compliance with immigration law and regulations, and an interview with any other individuals or review of any other records that the USCIS considers pertinent to the integrity of the organization. An inspection may include the organization headquarters, or satellite locations, or the work locations planned for the applicable employee. If USCIS decides to conduct a pre-approval inspection, satisfactory completion of such inspection will be a condition for approval of any petition.

On October 26, 2018, a compliance review inspection was conducted of your facility at 1428 Zerega Avenue, Bronx New York 10462. The following discrepancies pertaining to the validity of the petition were noted.

Site visits finding revealed that the address is used as an Accounting Office, Business Center and advertised as Homeward Bound Program (HBP) Student Grant Research Center. A decision rendered by Supreme Court of the State of New York County of Bronx on October 19, 2005 Mr. Edwin RIVERA, Director of Homeward Bound Program was ordered to stop engaging in the unlawful practice of immigration law and to pay $24,331.00 to the Attorney General of New York, so the victim s who had been defrauded by Mr. RIVERA could be paid back. However, records indicate that Mr. RIVERA, HBP or both have still been listed on application submitted to US Citizenship and Immigration Services (US CIS) from the time of the decision up to the present time.

Doubt cast on any aspect of the petitioner's proof may lead to a reevaluation of the reliability and sufficiency of the remaining evidence offered in support of the visa petition. The petitioner must resolve any inconsistencies in the record by independent objective evidence, and attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth, in fact, lies will not suffice. *Matter of Ho*, 19 I. & N. Dec, 582.591 (BIA 1988).

The petitioner has not overcome the credibility issues raised. Under the regulation at 8 CFR 214.2(r)(16), if USCIS decides to conduct a pre-approval inspection, satisfactory completion of such inspection will be a condition for approval of any petition.

Here, the petitioner did not satisfactorily complete the inspection.

You are afforded 30 days from the date of this notice to submit additional information, evidence or arguments to support the petition. Additionally, when USCIS serves a notice by mail, three days are added to the prescribed period in which to respond. Any such evidence or arguments will be carefully reviewed prior to a final determination in this matter. Failure to respond, however, will result in adjudication of the petition on the basis of the record, as it is now constituted, including the information referred to above.

**Your response must be received in this office by April 9, 2019.**

Any response to this notice should be sent to the following address:

**U.S. CITIZENSHIP AND IMMIGRATION SERVICES**
**P.O. BOX 10590**
**LAGUNA NIGUEL, CA. 92607-0590**

For more information, visit our web site at: **www.uscis.gov**

Or, call us at: **1-800-375-5283**

Telephone service for the hearing impaired: **1-800-767-1833**

Sincerely,

*Kathy A. Baran*

Kathy A. Baran
Director, California Service Center
Officer: SZ0101

March 7, 2019

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
California Service Center
Laguna Niguel, CA 92607-0590



**U.S. Citizenship
and Immigration
Services**

EDWIN RIVERA
HOMEWARD BOUND PROGRAM
1428 ZEREGA AVENUE
BRONX, NY 10462



WAC1890402086

Form I-360, Petition for Amerasian, Widow(er), or
Special Immigrant



A078-206-656

## NOTICE OF INTENT TO DENY

On September 21, 2018, Homeward Bound Program dba Christian Ministry of Family Integration,
filed Form I-360, Petition for Amerasian, Widow or Special Immigrant, with U.S. Citizenship and
Immigration Services (USCIS), seeking to classify Gladis Consuegra De Collado as a Special
Immigrant Religious Worker under section 101(a)(27)(C) of the Immigration and Nationality Act
(INA or "Act").

USCIS reviewed the record of evidence in accordance with the INA and Title 8, Code of Federal
Regulations (8 CFR), and determined the evidence does not demonstrate eligibility for the
classification. Therefore, USCIS intends to deny the petition.

When USCIS intends to make a decision that will be adverse to the petitioner, based on information of
which the petitioner is unaware, USCIS must notify the petitioner and allow a period of time for
rebuttal.

8 CFR 103.2(b)(16)(i) states:

> If the decision will be adverse to the applicant or petition and is based on derogatory
> information considered by the Service and of which the applicant or petitioner is unaware,
> he/she shall be advised of this fact and offered an opportunity to rebut the information and
> present information in his/her own behalf before the decision is rendered...

### Qualifying Position

The first issue to be discussed is whether you have established that the position offered to the
beneficiary qualifies as a religious occupation.

8 CFR 204.5(m)(5) states that the religious occupation must meet all of the following requirements:

(A) The duties must primarily relate to a traditional religious function and be recognized as a

religious occupation within the denomination;

(B) The duties must be primarily related to, and must clearly involve, inculcating or carry out the religious creed and beliefs of the denomination;

(C) The duties do not include positions which are primarily administrative or support such as janitors, maintenance workers, clerical employees, fund raisers, persons solely involved in the solicitation of donations, or similar positions although limited administrative duties that are only incidental to religious functions are permissible; and

(D) Religious study or training for religious work does not constitute a religious occupation, but a religious worker may pursue study or training incident to status.

8 CFR 204.5(m)(5) further defines a Religious Worker as:

An individual engaged in and, according to the denomination's standards, qualified for a religious occupation or vocation, whether or not in a professional capacity, or as a minister.

In addition, 8 CFR 204.5(m)(7)(vi) requires the petitioner attest to the following:

The title of the position offered to the alien . . . and a detailed description of the alien's proposed daily duties;

In making a determination regarding this classification, USCIS must distinguish between activities that are traditionally performed by volunteer members of the congregation, as part of the practice of their religious beliefs, and activities that are traditionally performed by specialized personnel.

Because the terms "traditional religious function" and "religious occupation" will necessarily differ depending upon the religion and specific denomination under review, USCIS must consider each position on its individual merits.

You seek to temporarily employ the beneficiary as a Religious Worker.

On October 26, 2018 you were requested to provide the required documentation to establish position offered to the beneficiary qualifies as a religious occupation.

On January 18, 2019 you responded to the request by providing the following documentation:

(a) A letter from the Internal Revenue Service recognizing that your organization is tax exempt under Internal Revenue Code (IRC) section 501 (c) (3);

(b) Constitution and Regulations of the petitioning organization;

(c) Mission and Program of the petitioning program; and

(d) Duties of the beneficiary.

Determining the status or duties of an individual within a religious organization is a distinct question from determining whether that individual qualifies for status or benefits under United States



immigration laws. Authority over the latter determination lies not with any ecclesiastical body but with the secular authorities of the United States, i.e., the designated representative of the Attorney General [now Department of Homeland Security]. Matter of Hall, 18 I. & N. Dec. 203 (BIA 1982); Matter of Rhee, 16 I. & N. Dec. 607 (BIA 1978); Kleindienst v. Mandel, 408 U.S. 753, 769-70, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); Unification Church v. Attorney Gen., 581 F.2d 870, 874 (D.C. Cir.), cert. denied 439 U.S. 828 (1978).

Since the burden of proof to establish eligibility for benefits sought rests with the petitioner under section 291 of the Act, simply going on record with unsupported statements without supporting documentary evidence does not satisfy the burden of proof in these proceedings. Matter of Treasure Craft of California, 14 I. & N. Dec. 190 (Reg. Comm'r 1972).

Therefore, you have not established that the beneficiary will be working in a qualifying religious occupation.

**Two-Year Qualifying Work Experience**

The second issue to be discussed is whether the beneficiary has been continuously employed as a religious worker for at least the two year period immediately preceding the filing of the petition.

8 CFR 204.5 states, in part:

> (m) Religious workers -- This paragraph governs classification of an alien as a special immigrant religious worker as defined in section 101(a)(27)(C) of the Act and under section 203(b)(4) of the Act. To be eligible for classification as a special immigrant religious worker, the alien (either abroad or in the United States) must:
>
> (2) Be coming to the United States to work in a full time (average of at least 35 hours per week) compensated position in one of the following occupations as they are defined in paragraph (m)(5) of this section:
>
>> (i) Solely in the vocation of a minister of that religious denomination;
>>
>> (ii) A religious vocation either in a professional or nonprofessional capacity; or
>>
>> (iii) A religious occupation either in a professional or nonprofessional capacity.
>
> (4) Have been working in one of the positions described in paragraph (m)(2) of this section, either abroad or in…the United States, and after the age of 14 years continuously for at least the two-year period immediately preceding the filing of the petition. The prior religious work need not correspond precisely to the type of work to be performed. A break in the continuity of the work during the preceding two years will not affect eligibility so long as:
>
>> (i) The alien was still employed as a religious worker;
>>
>> (ii) The break did not exceed two years; and
>>
>> (iii) The nature of the break was for further religious training or for sabbatical…However, the alien must have been a member of the petitioner's

